Thank you, Your Honor. May it please the Court, my name is Matthew Houston along with Lee Hogwood of K&L Gates on behalf of the appellant Thomas Shane Matherly. We're here today because Mr. Matherly, as a civilly confined individual at F.C.I. Butner, a federal prison, is challenged the conditions of his confinement by the Bureau of Prisons. In many instances, he is confined under the same conditions as individual criminal inmates. In other instances, he's confined under worse conditions than individual criminal inmates. And we're here today simply seeking to have the Court establish that Mr. Matherly is entitled to the more considerate treatment and conditions of confinement that the Constitution guarantees him under Young, Burgby, Romeo, and other case law. So as background, if the Court would like a little bit of that, Mr. Matherly served a 41-month criminal sentence. He was released in 2006 or set for release in 2006. On November 22, 2006, the Bureau of Prisons detained him as a civilly committed person under the Adam Walsh Act. The Adam Walsh Act specifically requires the Attorney General to place a civilly detained or committed person with a state for custody, care, and treatment, or if it's unable to find a state, then for treatment in a suitable facility, presumably a federal facility. Here, the Bureau of Prisons makes no distinction, and they admit this on the record, between criminally sentenced inmates and individuals serving civil confinement, such as Mr. Matherly. They house him in the Maryland unit of FCI Butner, which aside from being a separate section of the prison, is no different than any other section. Well, I mean, in many instances where there is a distinction, but whether they make a distinction or not, in those instances where there's not a distinction, you'd still have to find that the absence of a distinction was somehow punitive. Correct, Your Honor, and our position is that the evidence here demonstrates that the Bureau of Prisons' actions are punitive. In certain instances, we would suggest that where they are the exact same, there is a presumption of punitive treatment under Jones v. Blanus. Where do you get that from? Jones v. Blanus is a Ninth Circuit case, Your Honor. It establishes that where a civilly confined person... There have been an awful lot of other cases that say that the fact that there's a simple similarity doesn't create a presumption of any kind of punitiveness, and I'm not sure that the Ninth Circuit goes as far as you're trying to push it. Well, it's a direct quote, Your Honor, and the Ninth Circuit specifically said that where a civilly committed person's conditions of confinement are similar to, the same as, or worse than... There could be many, many different administrative reasons for treating someone similarly, and that wouldn't amount, the fact that something serves an administrative purpose doesn't make it a punitive measure. I agree, Your Honor, and it's a rebuttable presumption. Under the court's Martin v. Gentile case, if there is no punitive intent, or if it is legitimately related to a governmental interest, or non-governmental interest, then it's not punitive. And so if the government can show that it's not punitive, if it is similar and there's a legitimate reason for it, then it would be acceptable. But in any event, as Youngberg establishes, civilly committed individuals are entitled to more considerate treatment and cannot be punished for any reason as a result of their civil confinement. The first part I would like to address here is the district court's error in granting summary judgment for the Bureau of Prisons on the issue of educational and vocational programming. Mr. Matherly claimed, and the Bureau doesn't dispute, that criminal inmates are entitled to vocational training from the Granville Community College program. Mr. Matherly, as a civilly detained person, is not. Federal prisoners, criminal inmates... dissimilar treatment, and then when you come down to the educational and vocational opportunities, then you seem to reverse course and say, well, we want to be treated exactly like the criminal defendants and have access to the same opportunities that they have. I mean, in some instances you want to be treated differently, and in other instances it seems you want the same thing. Well, I think there's a distinction, Your Honor. Where we're saying that he should not be treated like criminal inmates are for the policies and procedures that are applied to him on a general basis, such as solitary confinement. The Bureau utilizes solitary confinement, and they refer to it by different words, but it's solitary confinement for civilly committed individuals in the Maryland unit, just like they do for criminal inmates. And so for those purposes, we are saying that those policies and procedures, Mr. Matherly should not be subject to those policies and procedures as punitive. The educational and vocational opportunities are afforded the criminal defendants in order to enable them to be self-sufficient when they leave the institution, to try to give them some job skills. But with the civilly committed sex offenders, there's a whole different focus, and that is on treatment for a particular illness. And so you have these two different modes, or you have these two different programs, but each is geared to the particular needs of a certain population. And there's a treatment program for the sex offenders, and then there's a vocational and educational program for criminal defendants. And why wouldn't that be rationally related to legitimate penological objectives? I don't understand why the, you know, why it seems to me to make sense, because it's geared to the eventual restoration and well-being of the different populations involved. Well, I think the issue there, Your Honor, is that in addition to the CTP program, which we're not challenging that program in and of itself, but Mr. Matherly is also entitled to educational and vocational opportunities. Under Youngberg, the court recognized that civilly committed individuals are entitled to training which is reasonable in light of identifiable liberty interests and the circumstances of the case. Well, the Bureau of Prisons indicates that people who are taking the treatment program designed for sex offenders don't have a great deal of time for the educational and vocational program. Well, the Bureau of Prisons has actually acknowledged that they do still have time to take these programs. They might not have as much time, but they do have the time. And the Bureau of Prisons doesn't dispute that and doesn't dispute that individuals could take them. But right now, the Bureau of Prisons provides two hours of access. Then the question will come up, well, you have to make this program available, you have to make this program available, and everything. And what this complaint seeks to do is to, in highly conclusory terms, to just sort of suck us into the administration of the Buechner facility. Well, we're not asking the court to do that, Your Honor. We're simply asking that the court establish that Mr. Matherly is entitled to these programs. What programs? For how long? The educational and training programs. And suppose there are conflicts between the treatment program and the educational program. Well, Your Honor, I would note that not everyone participates. How many of these programs is he entitled to? All of them, for how long? I don't understand. Under the case law, Your Honor, he is entitled as a matter to more considerate treatment. Now, there's not a, as a matter of law, I don't think you can say that he's entitled to 43 versus 41. Even if you disagree with the administrative decision made here and giving them separate programs, how is that punitive? This is what, you know, this is what all the case law says, that you have to discuss, you have to find some punitive intent here. And I don't understand how these, the scheduling and the admissions requirement for these different educational programs, how does that, how does that exhibit a punitive intent on the part of the prison administrators? That's just an administrative question about which people can agree or disagree. And our position there, Your Honor, is that it's punitive and that these explanations are mere pretexts. The government contends that, for example, the reason that civilly confined individuals like Mr. Matherly aren't entitled to the same number of courses for the same number of hours is for safety reasons because they can't co-mingle civil inmates and criminally confined inmates. However, there are a number of occasions that are acknowledged in the record where there is co-mingling and where they can be done. And so our position is that... 88 hours a week, they have access to adult continuing education courses, access to GED courses where there's an identified need. Well, the record reflects a dispute as to whether GED programs are offered. The evidence we have suggests that GED programs are not offered to inmates. Are we supposed to get into that and say you're not offering enough adult continuing education courses? They are offering them and the civil detainees have access to them. I mean, we're trying... My problem is you're trying to get us to sort of supervise the curriculum of this institution, and I'm just not sure that's a federal court's job if we can't identify some punitive intent as opposed to administrators just trying to work out the different wrinkles and the particular tailoring of what courses they offer. We agree that they should work out those details, Your Honor. We're not asking you to work out those details, but we're saying where they have worked out those details and they don't meet the constitutional standard for more considerate treatment for individuals like Mr. Matherly, then the court's job is to step in and say these programs, as you've offered them, don't meet that standard. Are you going to go program by program? You can do it program by program. We're asking that the court simply require that more considerate treatment. The Bureau of Prisons can then go back and revise the programs to comply with these standards. But we're not asking you to address it, every single one. We're not saying that they have to be 41 hours, 42 hours and hours. Once we get into it, where's the stopping point? Well, Your Honor, I think once we've established that there is a punitive aspect to it or at least a dispute, and here the issue is summary judgment for these educational programs, so it's a dispute as to whether there is a punitive intent. I mean, Iqbal and Twombly indicate that you have to establish some plausible basis that you're going to prevail, and I haven't seen anything in this complaint other than a scattershot series of claims at a highly abstract level, and I haven't seen anything in the complaint that smacks of a punitive purpose. And it's just a lot of paint thrown against the wall in the hope that some of it will stick, and all of it attempts in a very conclusory, highly abstract fashion to draw the courts of them to the administration of this institution. That's not our job. It's not our role. We're not doing that unless we can find some sort of punitive action. Well, Your Honor, first I would note that it did survive a motion to dismiss, and so the district court did find that these aspects leaded it. No, but the case is dismissed. Well, yes, on summary judgment. I think your three issues that interest me is the co-mingling and the search procedure and the mail procedure. I mean, like Judge Wilkinson said, I don't know how we can fashion an order sufficient to satisfy you on these vocational opportunities, but what about those three? Thank you, Your Honor. As to the unnecessary strip searches and mass shakedowns, that is an issue. Specifically, Mr. Matherly pleaded that he has often strip searched after he has had disputes with individuals at the Bureau of Prisons, with workers, with co-civilly detained individuals. And the Bureau of Prisons doesn't dispute that. They don't dispute that the captains and lieutenants who perform these do so in their discretion. There are no written guidelines establishing when a strip search can occur, when a shakedown can occur. And Mr. Matherly's expert, Deb McCullough, recognized that shakedowns and strip searches are often used as retributive and retaliatory measures. Here the trial court simply accepted the explanation of safety without really addressing the issues. The Bureau of Prisons said, yes, it's a safety issue. The district court said, okay. And we say that Mr. Matherly has sufficiently identified information. In an institution of this size, it's important that there be searches for the safety of other residents and staff and that weapons and contrabands not come in. Certainly, Your Honor. And we don't dispute the use of strip searches as a general rule. We dispute the constitutionality of them as applied to Mr. Matherly when they're retaliatory and punitive based merely on the fact that he had a discussion with someone that the Bureau of Prisons didn't agree with. It's an administrative requirement. How is it how the strip search is punitive? It's not an administrative requirement to do it after I see my time has expired. How the search is punitive? The search is. Because they do serve a legitimate interest. Not necessarily if they are done in a punitive manner, Your Honor. And here where they are using strip searches and cavity searches simply to get back at someone for arguing or raising an issue they don't agree with, then it is punitive. And the evidence of that is simply his statement that it's happening? It is a verified complaint, Your Honor. It would hold the same force as an evidence. He's getting into the motives and intentions of the correctional officers in this case, and that doesn't seem to me to be enough, his say-so. Well, I think the timing aspect of it, he has recognized that these strip searches often occur immediately after these arguments and not at other times. And so I think a reasonable inference in his favor as the plaintiff could be drawn and should be drawn. Has Mr. Matherly ever been the subject of a strip search that's applied to him with punitive intent? Yes, Your Honor. And he pleaded that in his complaint, and the evidence demonstrates that on the record, that it has happened. He pleaded that it was a verified complaint that recognizes that. And so he has sufficiently provided evidence that, and with the issue of intent being something that this court has recognized should not be resolved on summary judgment in most instances, we believe that there's sufficient evidence for the court to take that to trial. Thank you. Ms. Kelly. Good morning. May it please the Court. My name is Christina Kelly. I represent the appellees in this matter. There are two primary issues in this case. First, the district court properly dismissed several of plaintiff's claims where he failed to allege claims that rose above de minimis restrictions. Second, the court properly granted summary judgment where plaintiff failed to present evidence sufficient to rebut the presumptions that the challenge conditions were reasonably related to legitimate government interests. Under Youngberg, there's no requirement that the conditions that civil detainees be subjected to, that they be equal to or better than those of sentenced inmates. The requirement is simply that the conditions be reasonably related to the purpose for which they're confined. And in this case, the plaintiff is involuntarily confined for the purpose of receiving treatment for his mental disorder related to his sexual offending. It's very different than those of the sentenced inmates where it's rehabilitation and punishment. Where the challenge conditions are, under Youngberg, based on professional judgment and they're reasonably related to government interests that are non-punitive, they're presumed to be valid, and that was the case in each of these. The defendants did not rely on one simple government interest for any of the challenge conditions except for the searches. In each case, there were several bases for the conditions, many of which were the overriding principle is the purpose for which the plaintiff is confined, which is treatment. Well, as for the mail issue, you got a lady running that program with no training and there's no written policy about handling the mail. What do you say about that? Well, with regards to the mail, there were several interests that are at stake there. One is maintaining security as far as the contraband and just overall screening to make sure nothing is coming in or being sent out. The other is promoting the rehabilitation of the detainees and also protecting individuals outside of the prison. With regards to the mail, it's not so much of a least restrictive means. The institution had tried a less restrictive means by random screening, and that's where they found that there were potential abuses of individuals in the community. The individual who does the initial screening of the correspondence, she's not the last level of screening. She does an initial screening and then presents any correspondence that she has questions about to the administrator. And then from there, the administrator of the CTP program, she at that point does not have the authority to restrict or deny the mail. It then goes to a third level where the warden has the final say-so on whether or not correspondence is rejected or goes through to the individual. In this case, the facts presented through the deposition were that most of the correspondence, even where it has something that may not be, so long as it's not contraband or otherwise, it does go through. The publications and that sort of thing receive a different screening, and even there, there's multiple levels of review. It's not a one-piece, one decision. And evidence was that plaintiff's own expert said where there's multiple levels, that reduces the level of arbitrariness. And here, there's multiple levels for each piece, for each review of the mail. And so that supports the reasonable government interest. How about as to the search? Did the district court give sufficient weight to the inferences in favor of the plaintiff in this case? I'm sorry? Did the district court give sufficient weight to the inferences that could have been drawn in favor of the plaintiff in this case? With regard to the searches? Searches, yes. I believe so, but there wasn't, it was still not enough to survive, to rebut the presumption that the searches are reasonably related to maintaining security. The plaintiff didn't present any evidence or any facts indicating that they were, that the searches were done to him with the intent, the specified intent to punish, or that they were applied to him in a manner that was, in fact, punitive. I think you've put your finger on the basic problem. And it's not to say that a case couldn't be made. It's just that in this record, there's not enough to go on. I mean, you can't just make a conclusory statement on your own motion that this is a punitive policy. You have to have something in the record that indicates that it may be impermissible. Now, maybe that, you know, maybe that exists. Maybe that can be done. But all I'm saying is that on this record, what was before the district court, it wasn't done. It's, I don't, you know, I don't know whether the strip search policy is the best that could be come up with. There may be an example somewhere where somebody uses this in a punitive manner. But on this record, the case simply has not been made. It's abstract. It's conclusory. And that just not, that just isn't enough. I agree. I agree. And that's the basic fallacy. It's not a big question of law. It's a question of whether this record makes the case. Some of these things are questions of law. The idea that, you know, and that's why I don't think enough care was given to this complaint. This challenge of the, under the Fair Labor Standards Act is squarely foreclosed by our decision in Harper and whatever the name of the case is. But our law is fairly, the FLSA doesn't require certain wages to be given people in a custodial relationship where the, in Harker it is, where the food, clothing, and shelter are provided. There's not the usual dynamic of an employee. But yet that's raised in the complaint. And, you know, the problem is that this hasn't been, this case hasn't been made. If you're going to upend the institutional practices of an institution, you have to come at it with more than this. I agree. Ms. Kelly, let me ask you a question about one of many claims, as Judge Wilkerson has pointed out in the complaint, is a contention that the defendants are violating Mr. Mathily's Fifth Amendment right to be secure and safe in the prison. He alleges that the prisoners often taunt and harass him and call him a baby raper and child molester, and that BOP personnel, at least the food service personnel, are aware of this and often laugh and ignore the harassment. Now, it seems clear to me that he doesn't have to wait until he's actually pummeled by fellow inmates to make out a claim. The response by the district court in this case was that Mathily failed to provide any details or dates about when these alleged threats occurred. I don't think he needs to do that at the pleading stage. So what was deficient about that claim? I mean, he pointed out incidences that suggest that there's a threat to his safety and security. He identified the fact that the BOP, or at least personnel in the prison, were aware of this and did nothing, in fact laughed about it. Doesn't that make out a claim? I don't believe so, and with the commingling piece, it's not so much as it's very incidental contact. It's not individuals sitting together, like sitting through an educational class or anything like that. It's very incidental, and it's under staff supervision. The commingling claim that the plaintiff raised in this case is almost identical to that that was raised in the Tims case that was also a similar Bivens case brought by an individual who's in the same situation as the plaintiff, civilly confined at FCI Butner under the Adam Walsh Act. And the claims are almost identical with the same name-calling and the commingling. And in that case, the district court also dismissed it as speculative under 12b-6. And this court, while it's not binding on this court, it is an unpublished opinion, it is instructive that this court's already looked at that and said that just simply saying that at some point something may happen, that's not enough to state a claim. There were no allegations that there were any actual assaults by sentenced inmates on detainees or that there was attempted assault or that the staff knew that there was a viable threat or anything more than just simply name-calling as plaintiff alleged and that they failed to take any action. It just wasn't enough. We would ask that this court decline to follow Jones. The holding in Jones is- At that point, I mean, I think it's a question of, again, whether something's at a speculative level or whether something that would be a more concrete issue of deliberate indifference. And, again, the question there is one of deliberate indifference. In most of the cases that we have, coming up here on deliberate indifference to an inmate's safety, oftentimes they're able to-most often those cases they point to some instance of physical harm or they point it to some situation where they're in a cell with a particularly dangerous criminal inmate or some incident or the imminent threat of some incident. But, I mean, a lot of what's talked about here is taunting. You know, again, it's just compared with all our other deliberate indifference cases, there's so much more concrete in what's present here. I agree. There were no allegations of specific dates that it happened or any indication from other CTP inmates or detainees? Well, I guess under your theory, it didn't matter. If he had provided dates, the taunting by itself wouldn't be enough. Well, it may be. If there were something further that he provided instances where staff knew that there was a threat or that it was a credible threat or anything like that and they simply disregarded it. Well, a threat versus a taunt. I don't think name calling- Prisons are not supposed to be very- Right. It's not a resort. It's involuntary detain. Right. He's not a judge prisoner. Correct. But that doesn't mean it doesn't occur. It occurs anywhere. One thing I would say is we all get taunted. A lot. At least sometimes I feel like I get taunted. It's the kind of thing that happens as a result of daily interactions. But the fact that somebody's taunting somebody by itself, that doesn't arise to deliberate indifference to any kind of serious need. Right. And there was evidence through the depositions that the primary- that sex offenders in general are not seen as their- have a more negative view from Senate inmates from non-sex offenders. And so that's part of the basis for keeping the two populations separate. So there may be- there is going to be some taunting, but that alone is not enough for it to survive the 12 v. 6. If there's no further questions, I'll simply ask the Court to affirm the District Court's rulings. Thank you. Thank you. May it please the Court. My name is Lee Hogwood. I'm also with K&L Gates and representing Mr. Matherly. I do want to address the punitive intent questions that were raised during the opening argument. Mr. Matherly filed his complaint a little over six years ago as a pro se complaint. This is the first day that Mr. Matherly's case has been in court for a hearing. I read that complaint about four and a half years ago, and my reaction was an overwhelming sense of hopelessness as it related to him. in confinement as a civilly confined person, disciplined like a criminal with the rules applied to him without regard to his status as a civilly confined person, deprived of the advantages that some of the criminal inmates received. And the reason for that deprivation is because he can't be protected for the reasons and those like him can't be fully protected if they commingle in the way that they would have to commingle in order to enjoy those same opportunities. They are a despised minority within a population that is a despised minority. They're segregated for their own protection. And as a consequence, they have less access to these things that happen to be important to Mr. Matherly. And who's to say that the education, Your Honor, just briefly, because who's to say that a man who learns how to fix a car or build a shelf or do carpentry in some other way might not find healing in that context as opposed to the training and treatment that has been prescribed in the institution. And he is civilly committed. He's entitled to determine his course of treatment as best he can. This very statutory structure stands on a razor-thin constitutional decision by a 5-4 Supreme Court. It is problematic. It is problematic, and we see that it's problematic because these cases come to you. on a regular basis. I haven't been here very many times, but each time I have come here the night before I have started from the beginning of the record and I have read every page of it as best I could. And I was struck by Dr. Stainhower's testimony that we were able to elicit from her during the course of her deposition. She identifies this dilemma. Her job was to supervise the CTP program. She was working hard, as she says, as an advocate in between these civilly committed persons and the prison officials to try to mediate many of these issues. But the suitability of the facility was something that she could never fully mediate, and it is, as a consequence of these problems, the mission of the Bureau of Prisons is to confine and to punish. That is their mission, and they do it well. They do it well. The mission of this program is to do something different. One of the things is that they've, these, some of the things that you say, I think as a general matter may well be true, and I'm sure that sex offenders are not a popular part of an institutional population, but the administrators also have a very tough job with this. And I would say to you, you know, bring me the case. Show me the specifics. And if you do that, but I think I don't want to be repeating myself, but the problem is not the truth of your theoretical proposition. The problem is the backup, and I just, you know, I think I've sat on these deliberate indifference cases so many times, and I've sat on strip search cases so many times, and those complaints, the ones that make headway are, and the summary judgment records that make headway are those that get down into the nitty-gritty and provide some specificity and provide examples of abuse in human terms that reach the court. And that sort of, you need to do it on a very human level and show an abuse in a very specific way to people that was done in other cases, but that's absent here. Your Honor, I'm out of time. May I respond to that comment? Sure. We obviously felt as if we had done so through the depositions that we took of Dr. Steinhauer through our expert and through others, and we have the belief that if we were able to put Mr. Mattely on the stand along with some other inmates there, we would have a case. But he's never had his day in court, and the justice that we're asking for is that he have his day in court to try this case. But you have to get your day in court, which is important. There has to be an issue of triable fact. And I would ask the Court, please, to look at Dr. Steinhauer's deposition and to look at our expert's deposition, and we think that those were sufficient to survive summary judgment, certainly on the issue of mail, strip searches, and some of the other issues that Judge Floyd mentioned. But thank you very much.
judges: J. Harvie Wilkinson III, Albert Diaz, Henry F. Floyd